No. 15-3415

---

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

---

Jacob Saathoff, Kathy Saathoff, and Kelsey Markou,
Plaintiffs-Appellants,

  v.

Andre Davis, Officer Number 7786,
Defendant-Appellee.

---

**Appeal from the United States District Court**
**For the Central District of Illinois**
**Case No. 2:13-cv-02253-CSB-EIL**
**The Honorable Judge Colin Sterling Bruce**

---

**BRIEF AND REQUIRED SHORT APPENDIX OF**
**PLAINTIFFS-APPELLANTS, JACOB SAATHOFF, KATHY SAATHOFF AND**
**KELSEY MARKOU**

---

SORLING NORTHRUP
Stephen F. Hedinger, of Counsel
Attorney for the Plaintiffs-Appellant
1 North Old State Capitol Plaza, Suite 200
Post Office Box 5131
Springfield, IL  62705
Telephone: (217) 544-1144
Facsimile: (217) 522-3173
sfhedinger@sorlinglaw.com

---

**ORAL ARGUMENT REQUESTED**

---

## <u>DISCLOSURE STATEMENT</u>

Jacob Saathoff, Kathy Saathoff, and Kelsey Markou are represented by Stephen F. Hedinger of Sorling Northrup, One North Old State Capitol Plaza, Suite 200, Post Office Box 5131, Springfield, Illinois 62705. Mr. Hedinger also represented Jacob Saathoff, Kathy Saathoff, and Kelsey Markou at the District Court for the Central District of Illinois, Urbana Division. Mr. Hedinger filed his Rule 26.1 Disclosure Statement with this Court on November 9, 2015.

Dated: February 23, 2016

By: ___/s/ Stephen F. Hedinger_____
Stephen F. Hedinger, Bar #6198999
Attorney for Plaintiffs-Appellants
Sorling Northrup
One N. Old State Capitol Plaza, Suite 200
Post Office Box 5131
Springfield, IL 62705-5131
Telephone: (217) 544-1144
Facsimile: (217) 522-3173
E-Mail: sfhedinger@sorlinglaw.com

# <u>TABLE OF CONTENTS</u>

Disclosure Statement ................................................................................................ i

Table of Contents ...................................................................................................... ii

Table of Authorities ................................................................................................ iv

I.      Jurisdictional Statement ................................................................................1

II.     Statement of Issues ........................................................................................1

III.    Statement of the Case .....................................................................................2

        A.      Statement of Facts ..............................................................................2

        B.      Procedural History and Rulings Presented For Review.......................10

IV.     Summary of Argument ..................................................................................10

V.      Argument ......................................................................................................13

        A.      The District Court Erred by Denying Plaintiffs' Motion for New
                Trial Based Upon Defendant's Discovery Violation .............................13

        B.       The District Court Erred in Refusing Plaintiffs' Proferred Jury
                Instruction That Was Based Upon Binding and Relevant Seventh
                Circuit Precedent....................................................................................27

        C.      The District Court Erred in Denying Plaintiffs' Motion for a New
                Trial Where the Jury's Verdict Was Against the Manifest Weight
                of the Evidence ......................................................................................34

        D.      The District Court Erred in Dismissing the City of Champaign as a
                Party Defendant on Summary Judgment Based Upon No Liability
                Under <u>Monell</u> ..........................................................................................36

VI.     Conclusion – Relief Sought ..........................................................................38

Certificate of Service ...............................................................................................40

Certificate of Compliance With F.R.A.P. Rule 32(a)(7) ............................................41

Circuit Rule 30(d) Statement ...................................................................................42

Attached Required Short Appendix

## TABLE OF AUTHORITIES

**Cases**

Alverio v. Sam's Warehouse Club, Inc., 253 F.3d 933 (7th Cir. 2001) ........................................27

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ...........36

Bronk v. Ineichen, 54 F.3d 425 (7th Cir. 1995)...........................................................24

Brown v. Muhlenberg Twp, 269 F.3d 205 (3d Cir. 2001)...................................................30

California v. Ramos, 463 U.S. 992, 103 S.Ct. 3446, 3460, 77 L.Ed.2d 1171 (1983)...................32

Carter v. Moore, 165 F.3d 1071 (7th Cir.1998)...........................................................34

Chang v. Michiana Telecasting Corp., 900 F.2d 1085 (7th Cir.1990) ...................................32

Celotex Corp. v. Catrett, 477 U.S. 317 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)........................36

David v. Caterpillar, Inc., 324 F.3d 851 (7th Cir. 2003) ..............................................23, 24, 26

Doe v. Burnham, 6 F.3d 476 (7th Cir. 1993) ..........................................................29, 32

EEOC v. Century Broadcasting Corp., 957 F.2d 1446 (7th Cir.1992) ...................................34

Enterprises, Inc. v. Avren, 639 F.2d 443 (8th Cir. 1981) ..............................................27

Fortina v. Quasar Co., 950 F.2d 389 (7th Cir. 1991)...................................................27

Harris v. City of Chicago, 266 F.3d 750 (7th Cir. 2001)...............................................26

Holiday Inns, Inc. v. Robertshaw Controls Co., 560 F.2d 856 (7th Cir. 1977) ........................26

Hussey v. Milwaukee County, 740 F.3d 1139 (7th Cir.2014)............................................36

Kapelanski v.Johnson, 390 F.3d 525 (7th Cir. 2004) ..................................................34

Klonoski v. Mahlab, 156 F.3d 255 (1st Cir. 1998).....................................................27

Krippelz v. Ford Motor Co., 750 F.Supp. 2d 938, 942 (N.D.Ill. 2010),
    rev'd on other grounds, 667 F.3d 1261 (Fed. Cir. 2012)...........................................27

Kvapil v. Chippewa County, Wis.. 752 F.3d 708 (7th Cir. 2014) .....................................37

Licciardi v. TIG Insurance Group, 140 F.3d 357 (1ˢᵗ Cir. 1998).....................27

Monell v. Dept. of Soc. Servs. of City of New York, 436 U.S. 658 (1978)............2, 12, 36, 37, 38

Nadworny v. Fair, 872 F.2d 1093 (1st Cir.1989).........................................32

Neal v. Newspaper Holdings, Inc., 349 F.3d 363 (7th Cir. 2003).................................34

Roach v. City of Evansville, 111 F.3d 544 (7ᵗʰ Cir. 1997).............................................37

Salgado v. General Motors Corp., 150 F.3d 735 (7ᵗʰ Cir. 1998) ...............................14, 23

Scott v. Harris, 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)......................................36

Spurling v. C & M Fine Pack, Inc., 739 F.3d 1055 (7th Cir.2014) .............................................36

Viilo v. Eyre, 547 F.3d 707 (7ᵗʰ Cir. 2008)...................................11, 12, 29, 30, 31, 32, 33, 34, 37

Westchester Fire Ins. Co. v. General Star Indem. Co., 183 F.3d 578 (7ᵗʰ Cir. 1999)...................13

Wilson v. Cook County, 742 F.3d 775 (7th Cir.2014) .................................................................36

## Statutes

28 U.S.C. §1291..........................................................................................................1

28 U.S.C. §1331..........................................................................................................1

28 U.S.C. §1367..........................................................................................................1

42 U.S.C. §1983.....................................................................................................1, 37

Fed. R. Civ. P. 26(e) ...............................................................11, 18, 19, 20, 22, 23

Fed. R. Civ. P. 37..........................................................................................1, 10, 25, 34

Fed. R. Civ. P. 59.....................................................................................................31

510 ILCS 5/5.............................................................................................................31

# I.    JURISDICTIONAL STATEMENT

The District Court had jurisdiction over the subject matter of the Complaint filed in this case pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1367,  as the Complaint sought relief pursuant to a federal statute, 42 U.S.C. §1983, to redress the deprivation under color of law of Plaintiffs' rights as secured by the United States Constitution.

The United States Court of Appeals for the Seventh Circuit has jurisdiction over this action pursuant to 28 U.S.C. §1291 because it is an appeal from a final order of the United States District Court for the Central District of Illinois.

Jury trial was held in this case from July 7, 2015 to July 9, 2015.  The jury entered a verdict in favor of Defendant on July 9, 2015, and also on July 9, 2015, the District Court entered judgment on the verdict.

Plaintiffs filed a Motion for New Trial and for Imposition of Discovery Sanctions pursuant to Rule 59 of the Federal Rules of Civil Procedure on August 6, 2015.

The District Court entered its Order denying the Motion for New Trial and for Imposition of Discovery Sanctions on September 30, 2015.  The September 30, 2015 Order is a final order that disposes of all parties' claims, and it is this Order that is sought to be reviewed.

On October 28, 2015, Plaintiffs filed their Notice of Appeal with the United States District Court for the Central District of Illinois.

# II.    STATEMENT OF ISSUES

1.    Whether the district court erred in denying Plaintiffs' motion for a new trial and finding the Defendant had committed no discovery violations where Defendant offered new evidence at trial that had not been disclosed despite discovery requests from Plaintiffs that directly requested that information.

2.     Whether the district court erred in refusing Plaintiffs' preferred instruction stating that the shooting of a pet dog is only reasonable where no alternative exists and the dog poses an immediate danger to persons, and instead providing an instruction that offered no guidance or explanation as to which facts or factors would be relevant to the jury's decision as to whether shooting Plaintiffs' dog was reasonable.

3.     Whether the district court erred by denying Plaintiffs a new trial where the jury's verdict in favor of the Defendant was against the manifest weight of the evidence.

4.     Whether the district court erred in dismissing the City of Champaign as a party defendant on summary judgment on the basis of no <u>Monell</u> liability where the city had an express policy authorizing the police to shoot and kill domestic pets even where alternatives to shooting exist and no person is in any danger, and where Defendant Davis acted in express compliance with that policy when he shot Plaintiffs' dog on November 17, 2012.

### III.     STATEMENT OF THE CASE

####   A.     Statement of Facts

Plaintiffs Jacob Saathoff ("Jake") and Kathy Saathoff ("Kathy") are husband and wife, and Plaintiff Kelsey Markou ("Kelsey") is Kathy's daughter and Jake's step-daughter (Transcript of July 7, 2015, at 28).  In November 2012, Kelsey was 18 years old. (Transcript of July 8, 2015, at 279). On November 17, 2012, all three resided on Crescent Drive in Champaign. (Transcript of July 7, 2015, at 28).

Jake, Kathy and Kelsey owned a chocolate-colored Labrador retriever dog named "Dog." (Transcript of July 7, 2015, at 35-37). They obtained Dog in 2008.  (Transcript of July 8, 2015, at 281-283).

Jake, Kathy and Kelsey also have another chocolate-colored Labrador retriever, a female

named "Boo." (Transcript of July 7, 2015, at 48).

Prior to and including November 17, 2012, Kelsey took both Boo and Dog on near-daily walks around the family's neighborhood. (Transcript of July 8, 2015, at 280-281). Kelsey would not walk the two dogs together, but rather would commonly walk Boo first, and then Dog. (Transcript of July 8, 2015, at 280-281).

Dog always wore a fabric collar that had attached his dog and rabies licenses. When Kelsey walked him, she also put on him, on top of the fabric collar, a metal "choker" collar for better control, and then attached a leash to that collar. He was wearing both collars on the evening of November 17, 2012, and the leash was attached to the choker collar. (Transcript of July 8, 2015, at 283).

On her walks with Dog, Kelsey would commonly follow a large figure-8 shaped route that would begin and end at the corner of Crescent Drive and John Street, about a half block north of her house. (Transcript of July 8, 2015, at 283-285).

Tyrone Jones ("Tyrone") had lived in a house located on Hollycrest Drive in Champaign, which is one block east of Crescent Drive. As of November 2012, Tyrone had lived at that address for about two or three years. (Transcript of July 8, 2015, at 163).

Tyrone had substantial experience with dogs as he grew up in Chicago.  His uncle had raised and fought pit bulls.  (Transcript of July 8, 2015, at 163-164).

The evening of November 17, 2012 was unseasonably warm and comfortable, and many people were out that evening enjoying the relatively comfortable temperatures. (Transcript of July 8, 2015, at 283-285).

Kelsey and Dog took their usual walk on the evening of November 17, 2012. Dog wore his usual collars and leash. By about 5:20 p.m. they had walked the route and returned to about

the corner of John Street and Crescent Drive, and were within about a half a block of being home.  (Transcript of July 8, 2015, at 283-286).

Also on the evening of November 17, 2012, Tyrone left his house on Hollycrest and went toward a friend's house located near the corner of John Street and Crescent Drive. Along the way, Tyrone came across a pit bull running loose in the area that was gray and white. (Transcript of July 8, 2015, at 164). Tyrone did not recognize the pit bull, and Tyrone stopped at several houses along the way to see if anyone recognized the dog. No one did. (Transcript of July 8, 2015, at 178-179).

Tyrone sat outside on his friend's front steps, and from that location Tyrone could see the intersection of John and Crescent.  (Transcript of July 8, 2015, at 178).

As Kelsey and Dog turned off of John Street and began to head south on Crescent, the pit bull spied them from across Crescent Street, and ran across the street toward them.  Kelsey saw the pit bull as he ran toward them.  (Transcript of July 8, 2015, at 178).

Once the pit bull reached Dog, the two dogs sniffed each other briefly, both alert to the other.  Then, without warning or provocation, the pit bull lunged toward Dog's neck, trying to bite and get a hold.  Dog immediately began to defend himself, and soon the dogs were locked in a fight. (Transcript of July 8, 2015, at 286-287).

Tyrone witnessed the beginning of the attack, and he ran across the street to assist Kelsey.  (Transcript of July 8, 2015, at 166).

At the beginning of the dogfight only Tyrone and Kelsey were present, but before long three juveniles also arrived at the scene and observed the fight. (Transcript of July 8, 2015, at 289).

As the dogs fought, Tyrone and Kelsey attempted to break them apart. (Transcript of July

8, 2015, at 166-167). Tyrone suggested that Kelsey drop Dog's leash in order to allow Dog to more freely defend itself, and Kelsey did so. (Transcript of July 8, 2015, at 286-287). Then they both tried kicking at the dogs, but were unsuccessful in parting them. (Transcript of July 8, 2015, at 288) Tyrone at one point also grabbed a nearby tree branch and tried to use it to lever between the dogs, but that was also unsuccessful. (Transcript of July 8, 2015, at 166).

Following a short period of fighting, Tyrone asked Kelsey if she wanted someone to call the police to obtain assistance. Kelsey agreed and someone telephoned the police and reported the dog attack. (Transcript of July 8, 2015, at 166, at 208).

The police dispatcher reported, over the radio, of a pit bull attacking another dog near the corner of John and Crescent. An officer other than Defendant Davis was initially identified as the responding officer to this call. (Transcript of July 8, 2015, at 208).

Defendant Davis, at the time of the dog fight call, was a police officer employed by the Champaign police department; he was at that time en route to a call of a residential burglary alarm, and his route took him past the corner of John and Crescent, as he passed the group of people surrounding the dogfight flagged him down, and so Davis pulled his squad car over. (Transcript of July 8, 2015, at 208-210). He trained his spotlight on the fighting animals. (Transcript of July 8, 2015, at 215).

Upon exiting his car, Davis inquired, and was told, that the victim dog belonged to Kelsey. Both she and Tyrone described to Davis that her dog was a chocolate-colored Labrador retriever, and was wearing a collar that had attached to it a leash. (Transcript of July 8, 2015, at 171, 215, 292).

Davis heard Kelsey and Tyrone describe Kelsey's dog (Transcript of July 8, 2015, at 215), but he claimed to have difficulty distinguishing between the two dogs' colors, and believes

both to have been dark in color. (Transcript of July 8, 2015, at 210-215).

Davis has a form of colorblindness that makes it difficult to distinguish between certain colors, including grays and browns; Davis has known of this condition since 1991. (Transcript of July 8, 2015, at 204). The colorblind condition worsens at nighttime, and the condition has had substantive impact on Davis's personal and professional life (Transcript of July 8, 2015, at 205-206). The condition sometimes makes it difficult for Davis to choose his clothing, and it has also had an impact on his abilities as a police officer; Davis described one incident where his partner pointed out a maroon car, but Davis saw it as a gray car (Transcript of July 8, 2015, at 205-206). Davis had never, prior to November 17, 2012, informed his employer, the City of Champaign, of his colorblind condition. (Transcript of July 8, 2015, at 206).

Davis also claims that, in addition to hearing Tyrone and Kelsey describe Kelsey's dog, the three juveniles were also yelling. (Transcript of July 8, 2015, at 216).

All persons present agreed that, at the time Davis was present, no person was in any danger from the fighting dogs, who were focusing their attention to each other. (Transcript of July 8, 2015, at 224-225, 195, 294-295). Further, all present agreed that neither of the dogs had suffered any notable injury, and no blood was to be seen (Transcript of July 8, 2015, at 170, 222, 268-269, 298).

Davis did not ask any further questions or engage in any further conversation after his initial words with Kelsey and Tyrone. (Transcript of July 8, 2015, at 220, 273, 294). Instead, he drew his service weapon and took aim toward the dogs. (Transcript of July 8, 2015, at 294). At that point, he was about two or three feet away from the dogs. (Transcript of July 8, 2015, at 297).

Davis fired one shot without any apparent effect. Within one or two seconds, he fired a

second shot, and this time the dogs separated.  Dog immediately began limping toward Kelsey, obviously wounded. (Transcript of July 8, 2015, at 301-302).

Upon seeing the results of the second shots, Kelsey shouted that Davis had shot her dog. She then moved to attend to Dog, who limped toward street and lay down. (Transcript of July 8, 2015, at 226, 172, 301-302).

After they separated, the pit bull began to move away from the scene, heading back toward Crescent. (Transcript of July 8, 2015, at 226-227).

Davis, remaining where he was at, pivoted and followed the pit bull with his gun, and fired four rounds from that location at the pit bull.  (Transcript of July 8, 2015, at 226-227). The pit bull ran across Crescent, toward some apartments on the other side of the street. (Transcript of July 8, 2015, at 226-227).

Davis followed the pit bull across Crescent Street, and fired one last, seventh round toward the pit bull. (Transcript of July 8, 2015, at 226-228).

The last round fired by Davis ended up going through the wall of one of the apartment units across Crescent Street, and landing on the floor of the unit's kitchen.  The police, following the incident, recovered that bullet. (D/e #47-4, at 52-55).

After shooting the final round toward the pit bull, Davis returned to where Kelsey and Dog were at, and requested via his radio for the attendance of a supervisor and for animal control. (Transcript of July 8, 2015, at 228-229). Kelsey asked Davis for assistance in getting Dog veterinary care.  Davis refused, though, stating that an ambulance would not be dispatched to the scene for treatment of a dog.  (Transcript of July 8, 2015, at 303-304).

Dog died as a result of the gunshot wound. (Transcript of July 7, 2015, at 57-58).

Davis's supervisor, Sergeant Crane, arrived at the scene within a minute or two after

Davis radioed. (Transcript of July 8, 2015, at 277-278).

Within approximately ten to fifteen minutes of his call, or perhaps less, the animal control officer arrived at the scene (Transcript of July 8, 2015, at 228-229).

At the time of the shooting incident on November 17, 2012, Davis had on his body or in his car, among other things, the following items:  OC spray (pepper spray), a fire extinguisher, his radio and a collaspsible ASP; the police department had a catchpole available for use. (Transcript of July 8, 2015, at 229-230).

Following the shooting incident, the City of Champaign Police Department conducted an investigation of Davis's actions.  Lieutenant Jon Swenson was responsible for the investigation. (Swenson dep., D/e #47-5, at 65-67).

Swenson considered the event to have consisted of three discrete phases:  two shots fired at Dog, four shots fired at the pit bull from the original location of the fight, and one shot fired at the pit bull from across the street. (Swenson dep., D/e #47-5, at 86-87).

Swenson, and ultimately the City, determined that Davis was in violation of City policy as a result of the final shot that entered the apartment building.  At that point, no human was in any danger, and no other justification existed for firing. (Swenson dep., D/e #47-5, at 97).

Swenson found that the four shots fired at the pit bull from the location of the dogfight were justified because Davis was fearful that the pit bull could turn aggressive and attack him or the other onlookers present at the scene. Accordingly, the City determined that those four shots were within Department policy for the protection of humans. (Swenson dep., D/e $47-5, at 97).

Swenson, and the City, determined that Davis's first two shots at Dog, that resulted in Dog's death, were also justified and within Department policy based upon the then-current

policy that allowed the use of deadly force against "a dangerous animal".  (Swenson dep., D/e #47-5, at 97, and 107-110).

From the time Davis arrived on the scene to the time he fired the seventh shot at the pit bull, only about two minutes had elapsed. (Transcript of July 8, 2015, at 173-174, 229, 299). Sergeant Crane reported that the dispatch records showed Davis arriving at the scene at 5:27, and he radioed for assistance at 5:29. (Transcript of July 8, 2015, at 110). From the time he arrived on scene to the time Davis fired his first shot at Dog, only about 30 or 40 seconds elapsed. (Transcript of July 8, 2015, at 299).  He fired his second shot only two or three seconds after the first (Transcript of July 8, 2015, at 301).

When Davis was cleared from the scene, he returned to the station and drafted his report, which was admitted into evidence as Plaintiffs' Exhibit 9A. (Transcript of July 8, 2015, at 212-213, 232-235).

Davis became employed as a police officer by the City of Champaign in 2004. (Transcript of July 8, 2015, at 201-202).

In about 2005 or 2006, Davis was called to serve as backup to another officer who responded to a fight between two tied-up pit bulls.  During that incident, the responding officer attempted to use a catchpole, attempted to beat the dogs to separate them, and attempted to use "OC" spray (i.e. pepper spray), none of which stopped the dog fight, and following which the responding officer obtained his supervisor's approval to shoot the pit bull that was winning the fight. (Transcript of July 8, 2015, at 202-203).

In about 2007, Davis, as a responding officer, was called to address a situation of two pit bull dogs fighting in a closed bedroom.  Davis contacted animal control officers, who arrived, stopped the fight, and took the dogs away. (Transcript of July 8, 2015, at 203-204).

### B.     Procedural History and Rulings Presented for Review

Plaintiffs filed their Complaint and Demand for Jury Trial on November 8, 2013 (D/e #1). The Complaint named as Defendants Defendant Davis and the City of Champaign.  The Defendants filed their Amended Answer on March 13, 2014 (D/e #18).

Following discovery, the Defendants filed their motion for summary judgment on March 31, 2015, and Plaintiffs filed their motion for summary judgment on April 6, 2015.  By order entered on May 18, 2015 (A-1 - A-26), the District Court ruled on the cross motions for summary judgment.  Among other things, the court held that Defendant City of Champaign should be dismissed from the action.

Jury trial was conducted on July 7, 8 and 9, 2015, and the jury rendered a verdict in favor of Defendant on July 9. (D/e #102).  The court entered judgment on the jury verdict that same day. (A-43).  Following Defendant's submittal of his bill of costs, the court entered an Amended Judgment on August 3, 2015. (A-44).

Plaintiffs filed their Motion for New Trial and for Imposition of Discovery Sanctions on August 6, 2015 (D/e #108).  By order of September 30, 2015, the District Court denied all relief on Plaintiffs' Rule 59 motion.  (A-45 - A-70).

This appeal seeks review of the court's order granting summary judgment in favor of the City of Champaign of May 18, 2015 (A-1 - A-26), and the Court's denial of Plaintiffs' Rule 59 motion entered on September 30, 2015 (A-45 - A-70).

### IV.     SUMMARY OF ARGUMENT

Plaintiffs first request this Court's relief as a result of Defendant's discovery violation.  In his answer to the complaint, Defendant stated that he had no knowledge of facts concerning options that may have been available to him instead of shooting at the fighting dogs on

November 17, 2012. Plaintiffs served an interrogatory on Defendant asking that Defendant describe in his own words all facts relating to the incident, including an explanation for each act that he took; Defendant's answer was that all information responsive to the interrogatory was included in his Police Report. Plaintiffs also asked Defendant for all facts upon which he relied in asserting that his actions were reasonable, and again Defendant stated that his Police Report was fully and completely responsive. At trial, Defendant testified that prior to arriving at the scene of the dogfight, the dispatcher had reported that one of the dogs was almost dead; Defendant also testified at length that prior to making a decision about what to do on November 17, 2012, he mentally reviewed an extensive list of potential options and scenarios, and purportedly finally decided that the best solution was to shoot at the fighting dogs. The claimed statement from the dispatcher that one of the dogs was almost dead was not included in the Police Report, and Defendant even testified that he had not "recollected" that statement until he was involved with trial preparation with his lawyer, after he was deposed. Additionally, the Police Report included no information about Defendant evaluating numerous options prior to shooting, and in fact that testimony was contrary to Defendant's Amended Answer. In light of these facts, Plaintiffs believe that Defendant has violated Rule 26(e) of the Federal Rules of Civil Procedure, and sanctions pursuant to Rule 37 are appropriate, and the district courts' denial of that relief was an abuse of discretion.

Plaintiffs' second request to this Court is for a finding that the trial court erred by failing to instruct the jury concerning the standard applicable to determine the reasonableness of an officer's shooting of a domestic pet. This Court's ruling in <u>Viilo v. Eyre</u>, 547 F.3d 707 (7th Cir. 2008), specifically stated that such a shooting can only be deemed reasonable under the Fourth Amendment if the animal in question "poses an immediate danger and the use of force is

unavoidable." 457 F.3d at 710. The jury was instructed here simply that they were to determine whether the shooting of Plaintiffs' pet was reasonable, and Plaintiffs' request that the jury be instructed with the <u>Viilo</u> standard was rejected. Plaintiffs believe they were prejudiced by that failure.

Plaintiffs' third contention is that the jury's verdict was against the manifest weight of the evidence, and the district court abused its discretion in failing to order a new trial as a result. During the trial, Defendant himself testified that he suffered from color blindness, and he knew that the most critical information provided to him by Plaintiff Kelsey Markou was that her dog was the brown one, and he claimed to have been unable to distinguish between brown and gray that evening, yet Defendant did not seek or request any further identifying information prior to deciding which dog to shoot. In light of the mere 30 seconds or so between Defendant's arrival on the scene and firing the first shot, it is clear that Defendant did not perform any analysis of the situation, and no reasonable jury could have determined that his actions were reasonable.

Fourth, and finally, Plaintiffs challenge the District Court's summary judgment ruling finding that the City of Champaign has no liability. In the event this Court rules in favor of Plaintiffs on one or more of the other three issues, Plaintiffs request that the City of Champaign be reinstated as a party defendant for a determination of liability pursuant to <u>Monell v. Dept. of Soc. Servs. of City of New York</u>, 436 U.S. 658 (1978). At the time of the incident in this case, the City had an express policy permitting its officers to use deadly force upon a domestic pet without any need to determine whether the animal posed an immediate threat, or whether other options were available. Defendant acted in compliance with that policy on November 17, 2012, and accordingly the City shares liability for the shooting of Plaintiffs' dog.

# V.     ARGUMENT

## A.     The District Court Erred by Denying Plaintiffs' Motion for New Trial Based Upon Defendant's Discovery Violation

In his Amended Answer to Plaintiffs' Complaint (D/e #18), Defendant stated that he lacked information concerning options that may have been available to shooting at the fighting dogs on November 17, 2012. In certain of his discovery responses, Defendant informed Plaintiffs that he had no further information about the events of November 17, 2012, beyond what he had written in his report (the "Police Report" (A-88)). At trial, however, Defendant testified contrary to his Amended Answer and interrogatory responses, and also stated that in some respects the Police Report was wrong, and Defendant provided substantial additional information about the events of November 17, 2012, beyond what was in the Police Report, including his asserted consideration of a number of options that may have been available to shooting at the dogs. Plaintiffs objected to this surprise testimony that was in direct opposition to Defendant's answer and discovery responses, and requested that Rule 37 discovery sanctions be imposed. That motion was denied; subsequently Plaintiffs reprised the motion in their motion for new trial, but the district court once again denied the motion.

The district court's denial of Plaintiffs' motion for new trial is subject to review under the abuse of discretion standard. Westchester Fire Ins. Co. v. General Star Indem. Co., 183 F.3d 578, 582 (7th Cir. 1999). The motion for new trial as to this issue was premised upon the district court's denial of Plaintiffs' Rule 37 motion, which is also subject to review for abuse of discretion. This Court has explained that, "[u]nder this standard, we shall affirm the judgment of the district court whenever we believe that the district court chose an option that was among those from which we might expect a district court reasonably to choose. As our case law makes very clear, however, this standard is not without teeth. In applying this standard, we scrutinize

the district court's determination to ensure that it invoked the correct legal standards and that its findings of fact are not clearly erroneous." Salgado v. General Motors Corp., 150 F.3d 735, 739 (7th Cir. 1998) (internal citations omitted).

Plaintiffs respectfully contend that the district court's denial of the Rule 37 motion and the motion for new trial were abuses of discretion.

Plaintiffs' Complaint included the allegation that, rather than shooting a dog to stop a dog fight at which no person was in any danger, Defendant had available a number of alternatives; the Complaint specifically alleged that Defendant could have called for Animal Control assistance, called for backup from other police officers, used his car's fire extinguisher, or used chemical mace (pepper spray) or other non-lethal means to separate the dogs. (A-77) (Complaint, para. 34 (D/e #1)). Defendant's Amended Answer to this allegation, filed in November 2013, stated: "Defendants neither admit nor deny the allegation as they lack sufficient knowledge or information sufficient to respond to the potential alternative actions listed in paragraph 34." (A-82) (Amended Answer, para. 34 (D/e #18)). Defendant never amended, supplemented, or otherwise changed his answer to paragraph 34 of the Complaint.

Plaintiffs' interrogatory number 7, served upon Defendant in August 2014, asked that Defendant "[d]escribe in Your own words the Incident, starting from the dispatch call that sent You to the Incident and ending with Your last involvement in any way Related to the Incident...," and also asked in particular for "Your explanation for each action You took, and state and describe precisely and exactly as You can what each person said." (A-85) (Plaintiffs' First Set of Interrogatories to Defendant Andre Davis, D/e #108-1) (emphasis added).

Defendant's answer to interrogatory number 7 was: "Ofc. Davis' recollection of the Incident at issue in this case is contained in the Champaign Police Dept. police report included in

the Aug. 5, 2014 document production, Champaign Case # cc 1211545." (A-85) (D/e #108-2).

Defendant does not dispute that this is a reference to the document that was introduced at trial as

Plaintiffs' Ex. 9A (A-88 - A-91), or that Defendant never served upon Plaintiffs any supplement

or amendment to his answer to interrogatory number 7.

In addition, paragraphs 41 through 44 of Plaintiffs' Complaint (A-78) (D/e #1) alleged

that "[t]he misconduct described in this Count was objectively unreasonable and was undertaken

intentionally and with willful indifference to Plaintiffs' constitutional rights," and "was

undertaken with malice, willfulness and/or reckless indifference to the rights of others,

specifically the rights of Plaintiffs in their property." Defendant's Amended Answer denied these

paragraphs (A-83) (D/e #18).  Plaintiffs' interrogatory number 10 asked that Defendant "Identify

all facts upon which You have based Your Answer, or have otherwise relied upon," in denying

those allegations. (A-86) (D/e #108-1).

Defendant's answer to interrogatory number 10 was: "All such facts are contained in the

Champaign Police Dept. police report included in the Aug. 5, 2014 document production,

Champaign Case # cc 1211545." (A-86) (D/e #108-2). Once again, Defendant does not dispute

that the referenced police report is the document that was introduced at trial as Plaintiffs' Ex. 9A

(A-88 0 A-91), nor that Defendant never served upon Plaintiffs a supplement or other

amendment to his original answer to interrogatory number 10.

Plaintiffs deposed Defendant on February 26, 2015 (more than six months after

Plaintiffs' interrogatories were served). Trial in this case began on July 7, 2015 (more than four

months after Defendant was deposed).

The sole issue concerning liability in this case to be determined by the jury was whether

the shooting engaged in by Defendant was reasonable.   The action proceeded to trial on

Plaintiffs' allegations that the shooting constituted a violation of their Fourth Amendment right to be secure in their possessions, and that the shooting was an unconstitutionally unreasonable seizure of their property (specifically, destruction of their dog). The parties were in agreement that shooting the dog constituted a seizure, leaving the sole factual issue for jury determination the reasonableness of the shooting. (Pre-Trial Order (D/e #67), at 1 – 2).

Defendant's interrogatory responses established that the full and complete explanation for Defendant's actions on November 17, 2014 was contained within the Police Report. The Police Report reflects that the dispatch call was for "a vicious pit bull dog running at large." (A-88). The Police Report also reflects that, "METCAD dispatched a call regarding a vicious Pit Bull dog in the area of John and Crescent." (A-88). Conversely, the Police Report says nothing about the dispatcher asserting that the dog being attacked was nearly dead.

The Police Report is also silent about any thought processes or considerations engaged in by Defendant, or any alternatives considered by him, prior to the shooting, except that the Police Report reflects that Defendant observed and considered which dog appeared to him to be the more aggressive, and based solely upon that determination Defendant decided which dog to aim at when he shot. (A-89). The Police Report is silent about any consideration of using OC spray to separate the dogs, or concerning the futility of calling for backup or Animal Control, or the unavailability of any officers to obtain the Department's catchpole, or any other alternatives. Further, the Police Report does not suggest that the two fighting dogs posed any current or potential danger prior to the time that Defendant shot one of the dogs.

Finally, the Police Report states: "As I pulled my vehicle up to this crowd I could see 2 dogs, both dark colored, one with a white belly ...." (A-89).

At trial Defendant testified at length in several ways that were contrary to his responses

to interrogatories number 7 and 10, and his answer to paragraph 34 of the Complaint. For one thing, at trial he stated that the dispatch call that referenced the dog fight had specifically stated that the dog being attacked was "almost dead" (Transcript of July 8, 2015, at 211), whereas both the Police Report and of his deposition testimony (see D/e #47-3, at 77) stated that the dispatcher reported simply that a dog was being attacked by a vicious pit bull. In fact, during trial Defendant admitted that the new description of the dispatch call was the result of discussions with his counsel held after Defendant had been deposed, and in fact while he and his attorney were preparing for trial (i.e., sometime between February 26 and July 7, 2015), during which his counsel "generated some recollection" and "refreshed [his] memory" (Transcript of July 8, 2015, at 259). Defendant's counsel argued directly to the jury, both during his opening statement (Transcript of July 7, 2015, at 20) and during his closing argument (Transcript of July 9, 2015, at 404), that even before he arrived at the scene Defendant believed that immediate action was necessary because of the report that the attacked dog was almost dead, thereby justifying Defendant's action of shooting at a dog within 30 seconds of arriving on scene. (Defendant's counsel made the same argument to the district judge in his Rule 50 motion made at the close of Plaintiffs' case – Transcript of July 8, 2015, at 333).

Defendant also testified for the first time at trial that in the 30 seconds between the time he arrived at the scene and the time he shot Plaintiffs' dog he ran through a "mental checklist" of options and strategies potentially available to him, including whether to call for backup, whether to call for the department's animal catchpole, whether to request Animal Control's assistance, and whether to attempt to use pepper spray on the dogs (Transcript of July 8, 2015, at 240-247). None of these "mental checklist" items were mentioned or discussed in the Police Report, and Defendant had previously informed Plaintiffs, through his Amended Answer to the Complaint,

that he lacked "sufficient information to respond to the potential alternative actions." Defendant's trial testimony was new information directly responsive to Plaintiffs' interrogatory number 7 (asking, among other things, for an "explanation for each action You took"), and directly contradictory to both his Amended Answer and interrogatory response.   Again, Defendant's counsel argued both during his opening statement (Transcript of July 7, 2015, at 23-25), and during closing (Transcript of July 9, 2015, at 405, 410, 412-413) (and during his Rule 50 argument – Transcript of July 8, 2015, at 333 – 334), that Defendant acted reasonably in considering carefully these and other factors before deciding that the best course was to shoot a dog.

Defendant also testified at trial contrary to his interrogatory response by asserting that the Police Report, rather than being a repository of all of his recollection of the events in question (as he stated in his interrogatory answer), was instead merely an incomplete summary of those events. (Transcript of July 8, 2015, at 259, 267).  Defendant even testified at trial that some of the things he wrote in the Police Report were not only incomplete, they were wrong -- although the Police Report stated that he recognized immediately upon arrival that one dog had a white belly, at trial he testified that he could not distinguish the brown dog or the dog with the white belly until sometime after the dogs had separated. When confronted with the discrepancy he merely stated -- "I know I wrote it, but that's not accurate." (Transcript of July 8, 2015, at 222; see also id. at 260-261).

Rule 26(e)(1)(A) of the Federal Rules of Civil Procedure provides. in pertinent part, that: "A party . . . who has responded to an interrogatory . . . must supplement or correct its disclosure or response:   (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information

has not otherwise been made known to the other parties during the discovery process or in writing."

Defendant himself testified that the information about the dispatcher became "known" to him only at a conference with his attorney in preparation for trial. Defendant has not, and cannot, point to any discovery response or supplement or other writing in which he ever notified Plaintiffs either of his knowledge of the dispatcher information or of his purported mental analysis. There is no question that this new information materially changed his answer (which, again, was that his entire "recollection of the incident at issue in this case is contained in the Champaign Police Dept. Police Report . . .") Defendant clearly violated Rule 26(e) by having failed to supplement his discovery responses.

Defendant's response to Plaintiffs' motion for new trial defended his testimony concerning the dispatch communication by arguing that the dispatch log asserting that the victim dog was "almost dead" had been available during discovery, and in fact had been the subject of questioning by Plaintiffs' counsel during the depositions of both Sgt. Matthew Crane and of Defendant, but that the failure of Plaintiffs' counsel to actually show the dispatch log to Defendant was either "a strategic decision or simply an oversight" which now precludes Plaintiffs from arguing that Defendant should have identified this new evidence prior to trial. (D/e #110, at 3 – 4). Defendant argued that his position that the dog fight "was an emergency situation in which time was of the essence" should have informed Plaintiffs that the content of the dispatch log was "an important issue at trial," and so Plaintiffs should have conducted themselves in some different way. (D/e #110, at 5). Defendant also asserted that Plaintiffs were not prejudiced because they were able to, and did, cross examine Defendant about the surprise testimony. (D/e #110, at 5).

Defendant's  justification of his ambush tactics is baseless –

(A)    Regardless of Plaintiffs' knowledge of the dispatch log and its contents, Defendant informed Plaintiffs only that he heard the dispatcher say that dog was being attacked, not that the dog was almost dead. His trial testimony was in direct contradiction of his earlier interrogatory response, and he never corrected or supplemented the response.

(B)    Sergeant Crane testified in his deposition that what is written in the dispatch log is not necessarily what the dispatcher said over the air (D/e #110-2, Crane dep., at 71-72). Defendant confirmed at trial that information included in the dispatch report is not necessarily the same as what the dispatcher said, and he admitted that he didn't see the dispatch ticket at the time of the incident (Transcript of July 8, 2015, at 266-267) -- in fact, he didn't see the dispatch ticket at all until he met with his attorney to prepare for trial (Transcript of July 8, 2015, at 269).  What was written on the dispatch log was accordingly not conclusive of what Defendant heard, and Plaintiffs had no reason to think it was or might be.

(C)    Plaintiffs were entitled to, and did, rely upon Defendant's interrogatory answer that was never supplemented or amended. There is no burden expressed anywhere in the Federal Rules of Civil Procedure that an inquiring party must affirmatively re-question his opponent about issues the opponent has already answered; conversely, there is an express duty for the answering party to supplement his answer with new or corrected information. Fed. R. Civ. P. 26(e)(1)(A).

(D)    Defendant admitted at least three times during trial that his trial testimony concerning the dispatcher statement was developed only after he was deposed, and in fact

only during the time he and his lawyer were preparing for trial. (Transcript of July 8, 2015, at 237-238, 259, 269).  In fact, he admitted that during his deposition he "didn't recall" having heard the dispatcher say that one dog was almost dead. (Transcript of July 8, 2015, at 211-212). Accordingly, even if Plaintiffs had suspected that Defendant would change his story, questioning him at his deposition directly about the contents of the dispatch log (more than they did) wouldn't have produced any different result. (Notably, Defendant failed to explain why his own counsel waited until after all of the depositions were completed before discussing the dispatch report with him, even though it was specifically discussed during Crane's deposition a full week before Defendant's deposition – D/e #110, at 3 – 4).

(E)    Defendant's argument that Plaintiffs weren't prejudiced is completely meritless – had Plaintiffs known about Defendant's new "recollection" of what he thought the dispatcher said, Plaintiffs surely would have conducted additional discovery, including obtaining any available transcript or recording of the actual dispatch communication, and/or questioning other officers who had been on duty, or questioning the dispatcher herself,  about what the dispatcher had said; as things were, though, Plaintiffs had no reason to do so, since Defendant had specifically answered Plaintiffs' specific question by stating that everything he knew about the incident, including what the dispatcher said, was included in his report, which said  nothing about the dog supposedly being almost dead.

Defendant similarly defends his new testimony concerning the "mental checklist" he claims to have reviewed prior to shooting Plaintiffs' dog, and the other ways his trial testimony conflicted with his earlier discovery response, on the basis that the "topics" of a shift change and

pepper spray, along with the overarching topic of Defendant's claim that the situation was an emergency that required immediate action, were sufficiently known to the parties both through other discovery and through the pleadings to have informed Plaintiffs about the possibility that Defendant may have more information about his mental processes and observations at the scene than was expressed in his interrogatory answer; "Plaintiffs had the opportunity to explore a topic more fully during depositions and simply failed to do so." (D/e #110, at 6). Defendant points to his motion for summary judgment as proof that Plaintiffs were aware that Defendant believed the situation was an emergency requiring "'spur-of-the-moment assessments and decisions'" (D/e #110, at 6), and concludes that these "topics" had "otherwise been made known to the other parties during the discovery process," and so Defendant was in compliance with Rule 26(e)(1)(a) of the Federal Rules of Civil Procedure (D/e #110, at 6).

Contrary to Defendant's assertion, Rule 26(e)(1)(a) does not provide that it is sufficient for a party to make a "topic" known to the other side, but instead the Rule requires a party to "supplement or correct its ... <u>response</u> [to an interrogatory] ... in a timely manner if the party learns that in some material respect the ... response is incomplete or incorrect, and if the additional or corrective <u>information</u> has not otherwise been made known to the other parties during the discovery process or in writing" (emphasis added). Merely identifying a topic is not enough to relieve a party from the obligation to <u>correct</u> information previously given if that party learns that the information is incorrect, or to <u>supplement</u> information previously given if the party learns that the prior information was incomplete. Defendant completely fails to explain why he did not supplement and/or correct his interrogatory response that specifically (but apparently untruthfully) informed Plaintiffs that all information known to Defendant concerning his decision-making process at the time of the incident was included in the Police Report.

Plaintiffs had a right to rely upon the interrogatory responses, and had no reason to further question Defendant on those "topics" since Defendant had already answered them to Plaintiffs' satisfaction – particularly since the interrogatory responses (which included no discussion of a mental checklist) were fully consistent with Defendant's Amended Answer stating that he lacked sufficient information to respond to the "potential alternative actions" suggested by Plaintiffs' Complaint. The Rules simply do not require a party to assume that a direct answer to an interrogatory is a lie, yet that is, in essence, what Defendant proposes. Finally, Defendant fails to explain why the arguments made in his motion for summary judgment, filed after the close of discovery and which did not include any discussion of a mental checklist or other thoughtful consideration of available alternatives, should have been sufficient to allow Plaintiffs to prepare for this brand new information at trial.

It is therefore clear that Defendant violated Rule 26(e). Pursuant to Rule 37(c)(1) of the Federal Rules of Civil Procedure, as applicable to this situation, "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . at a trial, unless the failure was substantially justified or is harmless."  The rule further provides for alternative or additional sanctions, including "payment of the reasonable expenses, including attorney's fees, caused by the failure."  As this Court has expressed, "the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation . . . was either justified or harmless."  David v. Caterpillar, Inc., 324 F.3d 851, 857 (7th Cir. 2003), quoting Salgado v. General Motors Corp., 150 F.3d 735, 742 (7th Cir. 1998).  To assist the district court in determining whether to exclude, this Court has identified four factors for consideration:  "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and

(4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." David, 324 F.3d at 857, citing Bronk v. Ineichen, 54 F.3d 425, 428 (7th Cir. 1995).

Application of the four identified factors warranted exclusion of Defendant's new evidence at the time of trial. The new evidence came as a complete surprise to Plaintiffs, and was offered at a time and in a way that precluded them from developing or offering countervailing evidence; moreover, it seems clear that the jury verdict was largely, if not entirely, the result of that new, surprise evidence. Further, the failure to disclose was not harmless, but to the contrary was deeply prejudicial to Plaintiffs and resulted in the jury verdict in favor of Defendant in this case. Without the undisclosed evidence, the jury had before it a Police Report, and testimony from three eyewitnesses, that established that Defendant arrived at the scene and thirty or forty seconds later shot Plaintiffs' dog. During the intervening thirty or forty seconds, Defendant shined his car's spotlight on the fighting dogs, walked from his car to near where the dogs were fighting, spoke very briefly and only a single time with the eyewitnesses, unholstered his gun, took aim, and then fired. This brief span of a half of a minute or so did not provide time for Defendant to contemplate and evaluate various options, and in any event Defendant at no time stated that he did so, either in the Police Report, in his interrogatory answers, or in his deposition testimony, and based solely upon that evidence, it is clear that the jury would have to have found Defendant's actions to have been unreasonable.

Indeed, the clear unreasonableness undoubtedly prompted Defendant to develop this new testimony in the first place. Absent the new testimony, the jury was faced with an officer making a rash and uncontemplated decision unjustified by the existing circumstances (including that no person was in any danger and neither dog had any visible wounds). The new testimony, though, presented Defendant as experienced and trained, calmly and rationally contemplating the

situation and the circumstances, and even thinking ahead to potential consequences of the various options, and reaching a logical decision for a course of conduct - none of which had ever been expressed to Plaintiffs in any prior discovery response in this case, although Plaintiff had expressly asked. (Notably, Defendant's response to Plaintiffs' Rule 59 motion for a new trial on the grounds that the jury verdict was against the manifest weight of the evidence relied almost exclusively on this challenged evidence to support the verdict -- Defendant's Response to Plaintiffs' Motion for New Trial and for Imposition of Discovery Sanctions With Incorporated Memorandum of Law (D/e #110, at 10-12).

Had Plaintiffs received timely notification of Defendant's revised testimony, they certainly could, and would, have developed and presented evidence to rebut that testimony, in some cases conclusively.  Plaintiffs could, and would, have done among the following:

      a.      With respect to the purported information from the dispatcher that the dog being attacked was nearly dead, Plaintiffs would have obtained and offered a tape recording or a transcript of the actual dispatch (if available), or at least the testimony of other officers who heard the dispatch concerning their recollection of what was said, or even the testimony of the dispatcher herself.

      b.      Plaintiffs would have presented evidence to contradict Defendant's assertion that the time of this incident, at about a shift change, meant that no backup was available and no one could bring the catchpole.  Sergeant Crane had testified that he <u>was</u> on duty and available, and Plaintiffs certainly would have asked Sergeant Crane about the availability of other officers and about the availability of a catchpole.  Defendant, however, presented this testimony only after Plaintiffs had presented Sergeant Crane's testimony and allowed him to depart, and in any event, Plaintiffs had no advance notice

of this testimony and so could not have prepared for it.

   c.  Plaintiffs had virtually no opportunity to challenge Defendant's assertion that the use of OC spray would have created a hazard to nearby persons, but undoubtedly many of the witnesses deposed in this case, including Sergeant Crane and Lieutenant Swenson, could have spoken authoritatively on the truthfulness and accuracy of that testimony. Notably, both Sergeant Crane (Crane dep., at 93-94 (D/e #47-4)), and Lieutenant Swenson (Swenson dep., at 87-88 (ex. 5 to Plaintiffs' Motion for Summary Judgment, D/e #47-5)), acknowledged the option of using OC spray in the situation confronted by Defendant, but said nothing about any potential risk to bystanders.

The second of the <u>David</u> factors similarly counsels in favor of exclusion. In light of the timing of the evidence (in the middle of trial, after Plaintiffs had already put on the testimony of most of their witnesses, including those who may have been able to contradict the new evidence), and after Defendant failed to mention any of the new facts in any earlier pleadings, Plaintiffs were completely unable to cure the prejudice.

   Third, the only alternative to exclusion would have required an immediate halt to the trial in order to allow Plaintiffs to conduct some further discovery to adequately address the new testimony; the new evidence therefore certainly did disrupt trial.

   Fourth, Defendant has expressed virtually no justification for having failed to present this evidence in a timely fashion, or to have at least informed Plaintiffs of the supplemental information prior to trial.

   Exclusion of this evidence is amply supported by case authority. <u>See Holiday Inns, Inc. v. Robertshaw Controls Co.</u>, 560 F.2d 856 (7th Cir. 1977) (affirming exclusion of evidence first presented at the time of trial, and never provided in a pre-trial supplementary disclosure); <u>Harris</u>

v. City of Chicago, 266 F.3d 750 (7th Cir. 2001) (reversing and remanding for new trial where defendant had refused to answer questions based upon Fifth Amendment prior to trial, but then testified at trial, to plaintiff's surprise); Fortina v. Quasar Co., 950 F.2d 389 (7th Cir. 1991) (reversing and remanding for new trial based upon evidentiary errors, including introduction of surprise testimony at trial); Klonoski v. Mahlab, 156 F.3d 255 (1st Cir. 1998) (remanding for new trial where defendant introduced evidence at trial that had not been disclosed previously); Licciardi v. TIG Insurance Group, 140 F.3d 357 (1st Cir. 1998) (remanding for new trial where testimony of expert at time of trial differed from expert report previously produced); Iowa-Mo Enterprises, Inc. v. Avren, 639 F.2d 443 (8th Cir. 1981) (affirming trial court exclusion of evidence not disclosed prior to trial).

Accordingly, the evidence newly submitted by Defendant during trial should have been excluded pursuant to Rule 37(c)(1).  "To obtain a new trial based on an evidentiary ruling, the movant must show that: (1) a timely objection or motion to strike appears in the record, stating specific grounds for the objection if the specific ground is not apparent; (2) the erroneous ruling prejudiced the movant's substantial rights."  Krippelz v. Ford Motor Co., 750 F.Supp. 2d 938, 942 (N.D.Ill. 2010), rev'd on other grounds, 667 F.3d 1261 (Fed. Cir. 2012), citing Alverio v. Sam's Warehouse Club, Inc., 253 F.3d 933, 942 (7th Cir. 2001).

In compliance with these standards, Plaintiffs objected during the middle of Defendant's surprise testimony, and argued to the district court that Defendant's new testimony should be stricken.  That motion was denied, both then and when it was reprised in Plaintiffs' motion for new trial.  (Plaintiffs had also preemptively filed pretrial motions asking that Defendant be limited to testifying only to matters stated in the Police Report (D/e #49; D/e #56), but those motions were similarly denied. (A-27 - A-36; A-1 - A-26).

Further, introduction of that evidence substantially prejudiced Plaintiffs' rights. The new evidence was key and critical to the jury's verdict in favor of Defendant, and was sprung upon Plaintiffs at a time and in a manner that virtually precluded Plaintiffs the opportunity to challenge the testimony in any meaningful way.

Defendant is correct in asserting that his claim that the situation was an emergency calling for "spur-of-the-moment assessments and decisions" was an important issue in the case – in fact, Defendant's exercise of judgment (or lack thereof) was the single most critical matter for jury consideration. Defendant's surprise testimony of his own asserted contemplative analysis of the options available, and his claim to have affirmatively ruled out all choices save the one he ended up taking, allowed him to present himself to the jury in a way that Plaintiffs had no opportunity to counter or contradict, despite the fact that Plaintiffs diligently requested in discovery and in their pleadings the specific information which Defendant sprung upon them at trial. Had Plaintiffs known that Defendant would make the claims that he made for the first time at trial, they certainly would have modified both their discovery and their trial strategy. Plaintiffs would have called Lt. Swenson to testify at trial, since Lt. Swenson agreed during his deposition that other options had been available which Defendant failed to attempt, including both pepper spray and a fire extinguisher (D/e #63-1, Swenson dep., at 87). The new testimony, in fact, would have rendered relevant and admissible the facts concerning Defendant's seventh shot, which ended up inside a nearby apartment, and the subsequent discipline given to Defendant as a result of that shot and his actions, since Defendant's decision-making, judgment and mental processing would have been directly in issue (as the trial began, Defendant had not suggested that he considered any alternatives or conducted any analysis aside from determining which dog appeared to be aggressive and then shooting it, which didn't call into question his

mental processing). Defendant is therefore correct in admitting that his mental processing at the scene constitutes the single most important issue in the case, clearly supporting Plaintiffs' claim to severe prejudice as a result of Defendant's game of "hide-the-evidence," and of the materiality of the information that should have been, but wasn't, provided to Plaintiffs as a discovery supplement or correction.

**B.     The District Court Erred in Refusing Plaintiffs' Proferred Jury Instruction That Was Based Upon Binding and Relevant Seventh Circuit Precedent**

=Plaintiffs' motion for a new trial also objected to the instruction given by the district court for the definition of "unreasonable" in this Fourth Amendment context.   The instruction given was based upon Seventh Circuit Pattern Instruction 7.09, modified (see Court's Instruction #19), and the district court also cited this Court's ruling in Viilo v. Eyre, 547 F.3d 707, 710 (7th Cir. 2008). However, Plaintiffs submitted a proposed modification of this instruction (see Plaintiffs' Motion for Leave to Submit Modified Proposed Jury Instructions, D/e #90), and reiterated that request during the jury instruction conference (Transcript of July 8, 2015, at 354-355).  Plaintiffs' proposal was to add language directly from the Viilo case that is specifically applicable to the circumstances in this case - the shooting by a police officer of a domestic pet.

The standard of review applied by this Court to  a challenged jury instruction was explained in Doe v. Burnham, 6 F.3d 476, 479 (7th Cir. 1993): "We review jury instructions only to determine if the instructions as a whole were sufficient to inform the jury correctly of the applicable law. Reversal is warranted only if the instruction misguides the jury so much that a litigant is prejudiced. Under these standards, we conduct a two-pronged analysis. First, we determine whether the instruction misstates or insufficiently states the law. If so, we next determine whether the misstatement or deficiency likely confused or misled the jury causing

prejudice to a litigant." (Internal citations and quotations omitted).

The parties submitted their proposed Jury Instruction 19 (along with other instructions) with their proposed Pre-Trial Order (D/e #67). Plaintiffs subsequently requested that the Agreed Jury Instruction No. 19 be shown as withdrawn, and instead be substituted by the Plaintiffs' Jury Instruction No. 5. (D/e #90). Plaintiffs' proposed change to that instruction clarified that the shooting of Plaintiffs' dog constituted the "seizure," and also deleted the word "arrest", which is not a part of this case, and instead substituted it with "incident." Finally, the last sentence of Plaintiffs' proposed instruction is a direct quote from <u>Viilo v. Eyre</u>, 457 F.3d 707, 710 (7th Cir. 2008): "… the use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable" (citing <u>Brown v. Muhlenberg Twp</u>, 269 F.3d 205, 210-11 (3d Cir. 2001)).

The district court added a new instruction 18A, which defined the word "seizure" used in this case, and also modified Instruction 19 to substitute "incident" for "arrest." However, the district court rejected Plaintiffs' proposed insertion of the standard announced by the <u>Viilo</u> ruling (A-42), and instead simply instructed the jury as follows:

"You must decide whether Defendant's seizure was unreasonable from the perspective of a reasonable officer facing the same circumstances that Defendant faced. You must make this decision based on what the officer knew at the time of the arrest, not based on what you know now. In deciding whether Defendant's seizure was unreasonable, you must not consider whether Defendant's intentions were good or bad.

In performing his job, an officer can use force that is reasonably necessary under the circumstances." (D/e #101).

Plaintiffs respectfully submit that the district court's instruction insufficiently stated the law applicable to this case. The district court's instruction did not guide the jury in any way in determining the parameters of reasonableness in the context of the shooting of a household pet by a state actor, even though this Court has spoken directly to that issue in the <u>Viilo</u> decision.

Defendant defended the instruction given at trial in this case on the grounds that unlike the situation in Viilo, here the state law involved (Illinois) does not restrict police officers from shooting dogs -- according to Defendant, the Animal Control Act, 510 ILCS 5/1 et seq., "only applies to the owner of the dog and [Defendant] was not the owner of the subject dog," and in any event police officers are immune from potential liability under the Animal Control Act (D/e #110, at 10).

Defendant is wrong to rely upon Illinois law as somehow dispositive of this federal constitutional issue, as discussed below; moreover, Defendant was also plain wrong in asserting that the Illinois statute applies only to dog owners. Among other things, Section 5(c) of that statute, 510 ILCS 5/5(c), specifically provides that "...[A]ll municipal police officers shall cooperate with the Administrator and his or her representatives in carrying out the provisions of this Act." In any event, the point made in the Viilo decision was that aside from being a matter of "common sense," the limitation upon shooting only dogs that pose an immediate threat where no other alternatives are available was already consistent with the prevailing state law. Here the same is true – nowhere does the Animal Control Act authorize or condone the killing of a domestic animal other than by controlled euthanasia (not merely firing shots on the street), and importantly, Defendant has not identified any Illinois statute that would justify Defendant's actions here.

Defendant also argued that the Viilo holding is inapplicable here because it was decided upon a different set of facts than are involved here; the district court, in denying Plaintiffs' post-trial motion, agreed with Defendant's argument, stating that "[t]he facts of Viilo involved police officers coming to a house and shooting and killing a pet dog at the house. That is a much different situation from the facts of this case, where Defendant was flagged down at the scene of

a dog fight." (A-66; D/e #116, at 22). The fact that <u>Viilo</u> was decided under different factual circumstances, though, does not change the general applicability of the rule it announced – a rule supported by state law and common sense, but required by federal constitutional law. The context of the cited language of <u>Viilo</u> was this Court's rejection of the claim that the defendants should be entitled to qualified immunity for the shooting of the plaintiffs' dog, noting that by the time of the incident there, it was already well known and should have been known by the responding officers that "the use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable." 547 F.3d at 710. This is a general rule of Fourth Amendment law, supported by numerous authorities cited by the <u>Viilo</u> decision, and contrary to Defendant's argument, it does not turn or depend upon the nuances of whatever state the actor may be in. "The problem is that the norms embodied in the Constitution and the norms authorized by the [state] legislature are not necessarily interchangeable. In fact, a state may provide greater protections under its laws than the Constitution requires. *See California v. Ramos,* 463 U.S. 992, 1014, 103 S.Ct. 3446, 3460, 77 L.Ed.2d 1171 (1983); *Chang v. Michiana Telecasting Corp.,* 900 F.2d 1085, 1087 (7th Cir.1990); *Nadworny v. Fair,* 872 F.2d 1093, 1100 (1st Cir.1989). The [state] legislature's sense of reasonableness cannot be grafted onto the Fourth Amendment." <u>Doe v. Burnham,</u> 6 F.3d 476, 480 (7th Cir. 1993).

The instruction given by the district court was not wrong, but it was incomplete in failing to provide the jury with the applicable standard to apply in determining when the shooting by a police officer of a domestic pet can be considered "reasonable" under the Fourth Amendment. The given instruction provided virtually no guidance, but left the jury to its own devices to consider when and under what circumstances the constitution allows such a seizure. The <u>Viilo</u> ruling directly addressed at least some of the applicable parameters of that decision, and by

failing to include that guidance, the instruction given here was deficient.

The second prong of this Court's analysis of jury instructions for error is also apparent here – it is clear that the jury was confused or misled by the general instruction given, to Plaintiffs' prejudice.  The <u>Viilo</u> decision specifically provides that "the use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable." 547 F.3d at 710.  This language, proposed by Plaintiffs, would have guided the jury into examining Defendant's actions in terms of whether the two dogs fighting, or either of them individually, at that time posed an immediate danger, and whether the use of deadly force, at that time, was unavoidable.  As matters developed at trial, though, the jury clearly was persuaded by Defendant to consider the pit bull to be a dangerous instrumentality worthy of being shot regardless of the specific circumstances, including the lack of immediate danger and the availability of options.  Defendant admitted that he did not have any immediate fear for the safety or wellbeing of anyone present, but rather his only concern was that, if the dogfight were broken up, the "vicious pit bull" might turn upon and attack people who were present.  He also claimed to  consider that, although other options were potentially available (such as breaking up the fight using his ASP, or using OC spray), if the chosen option was successful, the result would then, and only then, result in a potential danger to bystanders by removing the pit bull from the distraction of its fight with Dog. Without the specific admonition from the <u>Viilo</u> case, the jury was free to, and was in fact encouraged to, consider it reasonable for Defendant to shoot the pit bull as simply a potential hazard, and not because of any immediate, actual danger; Dog was just collateral injury to Defendant's  preemptive strike against that potential danger. Further, Defendant's testimony acknowledged the existence of alternatives to shooting, but Defendant simply rejected each of those alternatives for various hypothetical

reasons without having attempted any, whereas <u>Viilo</u> makes clear that deadly force must be "unavoidable", not merely the most convenient choice.  Again, the jury was not guided with the language given.

**C.     The District Court Erred in Denying Plaintiffs' Motion for a New Trial Where the Jury's Verdict Was Against the Manifest Weight of the Evidence**

Plaintiffs filed with the district court their Rule 59(a)(1) motion for a new trial, which asserted that the jury's verdict of July 9 is against the manifest weight of the evidence. The evidence before the jury was that, at the time Defendant shot Plaintiffs' dog, there was no immediate danger to anyone.

This Court "review[s] a district court's decision to deny such motions [to amend judgment or for new trial] for abuse of discretion. *Neal v. Newspaper Holdings, Inc.,* 349 F.3d 363, 368 (7th Cir.2003); *Carter v. Moore,* 165 F.3d 1071, 1079 (7th Cir.1998). Under the abuse of discretion standard, 'the proper inquiry is not how the reviewing court would have ruled if it had been considering the case in the first place, but rather whether any reasonable person could agree with the district court.' *EEOC v. Century Broadcasting Corp.,* 957 F.2d 1446, 1460 (7th Cir.1992)." <u>Kapelanski v. Johnson</u>, 390 F.3d 525, 530 (7th Cir. 2004). Plaintiffs respectfully submit that here the district court's denial of Plaintiffs' Rule 59(a)(1) motion was such an abuse of discretion.

The unrebutted and undisputed facts, many of which Defendant himself presented, reveal that, on the evening in question, Davis:

- Arrived and within thirty to forty seconds shot Dog;

- During that half minute time span, spoke briefly with Kelsey and Tyrone;

- Learned that Kelsey's dog was colored brown and the pit bull was colored gray;

- Knew he was impaired with a condition that prevented him from distinguishing brown

from gray (that is, colorblindness);

- Knew his colorblindness has impeded both his personal life and his professional life in the past;

- Knew that the colorblindness was exacerbated by the dark, and knew that it was twilight and so becoming darker;

- Knew that, despite his colorblindness, one dog had a white belly;

- Knew that no person present was in any immediate danger from either of the two fighting dogs;

- Knew that a number of alternatives to shooting the dogs existed, including using his ASP, using OC spray, or calling for a supervisor, for backup, and/or for animal control;

- Without attempting any, rejected or disregarded all potentially available alternatives;

- Shot at one of the dogs with only 30 or 40 seconds of arriving on-scene without speaking further with either Kelsey or Tyrone;

- A bare minute and a half minutes later, called for a supervisor and for animal control (two alternatives he had rejected or disregarded only moments before), both of whom arrived within minutes.

During closing argument, Defendant's counsel admitted that shooting Plaintiffs' dog was a "mistake."  The undisputed and unrebutted facts reveal, though, that the only cause for that mistake was Defendant's colorblindness, which he alone knew about, and of which he knew the consequences.  Defendant admitted that, regardless of lighting conditions, shadows from his own search light beam, noises from the people gathered around, or any of the other excuses he cited, the fact is he heard Kelsey state that her dog was brown in color and that the attacking dog was gray (Transcript of July 9, 2015, at 377) – he simply did not take the

time or effort to determine, by asking for further information or by studying the dogs more closely or by any other means, which dog was brown and which was gray. Despite his impairment, Defendant failed to take any actions or precautions to avoid potential injuries or damages resulting from the impairment itself, and that is exactly what the "mistake" of shooting Plaintiffs' dog was. It was simply unreasonable, under these facts, for Defendant to have behaved as he did.

**D.      The District Court Erred in Dismissing the City of Champaign as a Party Defendant on Summary Judgment Based Upon No Liability Under <u>Monell</u>.**

Plaintiffs finally challenge the district court's grant of summary judgment in favor of Defendant City of Champaign, Illinois. This issue is only applicable in the event this Court remands on the basis of one or more of the above issues cited by Plaintiffs in this appeal.

This Court reviews "the district court's grant of summary judgment de novo and construe[s] all facts and reasonable inferences in the light most favorable to the non-moving party .... *See Wilson v. Cook County,* 742 F.3d 775, 779 (7th Cir.2014); *Hussey v. Milwaukee County,* 740 F.3d 1139, 1142 (7th Cir.2014). Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' *Spurling v. C & M Fine Pack, Inc.,* 739 F.3d 1055, 1060 (7th Cir.2014) (quoting Fed.R.Civ.P. 56(a)). A genuine dispute as to any material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining summary judgment motions, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.' *Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing that no genuine dispute exists as to any material fact. *See Celotex Corp. v. Catrett,*

477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)." <u>Kvapil v. Chippewa County, Wis.</u>. 752 F.3d 708, 712 (7th Cir. 2014).

Pursuant to <u>Monell v. Dept. of Soc. Servs. of City of New York</u>, 436 U.S. 658 (1978), municipalities are liable under 42 U.S.C. §1983 only for their own acts in violation of constitutional protections; typically this requires proof that the municipality's policies or customs were directly responsible for the violation.  "Before the City can be liable under Section 1983, the plaintiff must show either '(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." <u>Roach v. City of Evansville</u>, 111 F.3d 544, 548 (7th Cir. 1997).  In this case, Plaintiffs contend that the City is liable for having an express policy that was enforced in this case and which caused the constitutional deprivation.

As the undisputed facts in this case show, at the time Defendant shot Dog, the City's policy expressly allowed the officer to shoot a dog which an officer, in his own unchallenged and unfettered discretion, determined to be "dangerous." (Cobb dep., D/e 47-6, at 46-49, and Ex. 40; Swenson dep., D/e 47-5, at 109-110). The City conducted a review of Defendant's actions and determined that Davis's shooting of Dog was permitted under that express policy. (Swenson dep., D/e #47-5, at 97, and 107-110). However, the unrebutted facts show that neither of the two dogs involved in the November 17, 2012 dog fight posed an imminent danger to anyone (at best, the pit bull was an eventual potential danger, according to Defendant). Moreover, the City's policy does not require an officer to first  consider alternatives to using such deadly force. Accordingly, the City's policy exceeds the constitutional bounds of <u>Viilo v. Eyre</u>, 547 F.3d 707,

710 (7th Cir. 2008), which determined that shooting a household pet can be considered to be a "reasonable" seizure only where "the pet poses an imminent danger and the use of force is unavoidable." The City's express policy makes it liable to Plaintiffs under the standard announced by <u>Monell</u>.

## VI.     CONCLUSION – RELIEF SOUGHT

Plaintiffs request that this Court grant the following relief:

Rule in Plaintiffs' favor with respect to each issue above, and specifically find that the District Court abused its discretion in denying Plaintiffs' motion for a new trial on the basis of Defendant's discovery abuse and because the jury verdict was against the manifest weight of the evidence, and find that the District Court erred in refusing to instruct the jury with respect to the standard for determination of reasonableness of the shooting of a domestic pet by a police officer, and reinstate the City of Champaign as a party defendant for proceedings on remand. Plaintiffs request that this Court remand this matter to the District Court for a new trial, and that this Court direct the District Court to sanction Defendant for the discovery abuse by excluding the evidence that Defendant failed to provide to Plaintiffs during discovery, and by awarding Plaintiffs all fees and costs incurred in the original trial of this matter.  Plaintiffs request any and all other relief in their favor that is allowed by rule or statute, and that is warranted by the facts of this case.

Respectfully submitted,

JACOB SAATHOFF, KATHY SAATHOFF, and
KELSEY MARKOU
Plaintiffs-Appellants,


By:     /s/ Stephen F. Hedinger
        Stephen F. Hedinger, Bar #6198999
        Attorney for Plaintiffs-Appellants

1 North Old State Capitol Plaza, Suite 200
Post Office Box 5131
Springfield, IL  62705-5131
Telephone:  (217) 544-1144
Facsimile:  (217) 522-3173
E-Mail:  sfhedinger@sorlinglaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 23, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

The undersigned further certifies that on the February 23, 2016, two (2) copies of the foregoing Brief were delivered by placing same in the United States mail at Springfield, Illinois with postage fully prepaid to:

Mr. Thomas Yu
Thomas, Mamer & Haughey, LLP
30 E. Main Street, Suite 500
P.O. Box 560
Champaign, IL 61824

By:   /s/ Stephen F. Hedinger
      Stephen F. Hedinger, Bar #6198999
      Attorney for Plaintiffs-Appellants
      Sorling Northrup
      1 North Old State Capitol Plaza, Suite 200
      Post Office Box 5131
      Springfield, IL  62705-5131
      Telephone:  (217) 544-1144
      Facsimile:  (217) 522-3173
      E-Mail:  sfhedinger@sorlinglaw.com

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that this Brief conforms to the type-volume requirements of Federal Rule of Appellate Procedure 32(a)(7)(B).  The length of this Brief, excluding pages exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), is 12,317 words.

By:     /s/ Stephen F. Hedinger
                      Stephen F. Hedinger, Bar #6198999
                      Attorney for Plaintiffs-Appellants
                      Sorling Northrup
                      1 North Old State Capitol Plaza, Suite 200
                      Post Office Box 5131
                      Springfield, IL  62705-5131
                      Telephone:  (217) 544-1144
                      Facsimile:  (217) 522-3173
                      E-Mail:  sfhedinger@sorlinglaw.com

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) and (b) are included in the Appendix.

By:     /s/ Stephen F. Hedinger
Stephen F. Hedinger, Bar #6198999
Attorney for Plaintiffs-Appellants
Sorling Northrup
1 North Old State Capitol Plaza, Suite 200
Post Office Box 5131
Springfield, IL  62705-5131
Telephone:  (217) 544-1144
Facsimile:  (217) 522-3173
E-Mail:  sfhedinger@sorlinglaw.com

**ATTACHED REQUIRED SHORT APPENDIX**

**TABLE OF CONTENTS**

Amended Judgment of August 3, 2014........................................................................................A-44

Order of September 30, 2015 (Rule 59(e)) .................................................................... A-45 - A-70

Appeal No. 14-3789
Case No. 3:14-cv-03263-RM-TSH